IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DONALD W. GLAZER, KEVIN R. McCLELLAN, DANIEL L. MOSLEY, and EVAN A. STEIN | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 07 C 2284 |
| v. | ) ) | Hon. George W. Lindberg |
| ABERCROMBIE & KENT, INC., GEOFFREY KENT, ANDREW W. HARPER, ANDREW HARPER TRAVEL, INC., and JOHN DOE, a/k/a ANDREW HARPER, | ) ) ) ) ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Before the Court is defendants Abercrombie & Kent, Inc.'s ("A&K") and Geoffrey Kent's ("Kent") (collectively "Kent defendants") joint amended motion for summary judgment. A&K and Kent are the only remaining defendants in the case. The Court granted defendants Andrew Harper's and Andrew Harper Travel Inc.'s joint motion for summary judgment on March 24, 2009. At that time, the Court struck the Kent defendant's joint motion for summary judgment and gave them leave to file an amended motion.

The Kent defendants seek the entry of summary judgment in their favor and against the four individual plaintiffs, Donald Glazer ("Glazer"), Kevin McClellan ("McClellan"), Daniel Mosley ("Mosley"), and Evan Stein ("Stein") (collectively "plaintiffs"), as to all the remaining claims in the Fourth Amended Complaint ("complaint"). Plaintiffs' six remaining claims include Count I (violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 as to

A&K and Kent); Count II (common law fraud as to A&K); Count III (common law fraud as to Kent); Count V (negligent misrepresentation as to A&K and Kent); Count VII (violation of the Consumer Protection Acts of the plaintiffs' respective states as to A&K and Kent); and Count VIII (breach of guaranty as to A&K).  For the reasons set forth more fully below, the amended motion for summary judgment is granted as to Count I, the only claim involving federal law. Plaintiff McClellan is a citizen of Illinois and defendant A&K is an Illinois corporation. Therefore, the Court does not have independent diversity jurisdiction over the remaining state law claims.  *See* 28 U.S.C. § 1332.  The Court declines to exercise its pendent jurisdiction over the remaining state law claims and those claims are dismissed.

## *I. Plaintiffs' Response to Defendants' Local Rule 56.1 Statement of Facts*

Before the Court turns to the factual and legal analysis relevant to the pending motion, it must address plaintiffs' response to defendants' Rule 56.1 statement of undisputed facts.  In its March 24, 2009 order striking the parties' prior filings, the Court admonished the parties that all subsequent filings "must strictly comply with all applicable federal and local rules."  Local Rule 56.1(b)(3) requires the party opposing summary judgment to support any disagreements it may have with the moving party's statement of undisputed material facts with "specific references to the affidavits, parts of the record, and other supporting materials relied upon."  Plaintiffs denied a number of defendants' facts, but failed to provide citations to the record to support those denials. Local Rule 56.1(b)(3)(B) requires that "in the case of any disagreement" with one of the movants' proposed statements of fact, the opposing party must provide "specific references to affidavits, parts of the record, and other supporting materials" to support their alleged disagreement.  *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). "When a

2

responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Cracco,* 559 F.3d at 632. Therefore, the following facts are deemed admitted. *See* Defs. Facts ¶¶ 6, 8, 9, 10, 11, 15, 16, 18, 19, 32, 33, 35, 50, 51, 57, 59, 66, 77, 78, 81, 82.

## II. *Plaintiffs' Affidavits*

A plaintiff cannot "create an issue of material fact by submitting an affidavit that contradicts an earlier deposition." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 759 (7th Cir. 2006). "When a conflict arises between a plaintiff's sworn testimony and a later affidavit or declaration, the 'affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.'" *Pourghoraishi*, 449 F.3d at 759 (quoting *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 532 (7th Cir. 1999)). Plaintiffs have not asserted confusion or a lapse in memory as a basis for filing the supplemental affidavits. Therefore, to the extent those affidavits contradict plaintiffs' deposition testimony, the Court will not consider them. *Purghoraishi*, 449 F.3d at 759.

## III. *Relevant Undisputed Facts*

The following facts are undisputed unless specifically noted below. This case stems from each plaintiff's decision to join a luxury travel club – Distinctive Retreats by Abercrombie & Kent, later known as Andrew Harper's Distinctive Retreats, A Destination Club by Abercrombie & Kent (the "Club" or "Distinctive Retreats"). Each of the four individual plaintiffs followed a similar fact pattern in deciding to purchase memberships in the Club. McClellan and Mosley were the first plaintiffs to join the Club in February 2004, followed by Glazer in February 2005,

3

and Stein in April 2005. Each plaintiff received five primary documents from the Club including: (1) a Membership Agreement, (2) an Addendum to the Membership Agreement, (3) a Confidential Founding Membership Offering, (4) the Club's Rules and Regulations, and (5) a Member Bond. Plaintiffs received the first four documents (collectively "membership documents") prior to joining the Club. Each of the membership documents and the Member Bond state that Distinctive Retreats LLC is the owner and operator of the Club.

To join the Club, each plaintiff signed the Membership Agreement and Addendum and mailed them to the Club with the remaining balance due on their membership payments ($392,000 for McClellan; $392,000 for Mosley; $425,000 for Glazer; and $450,000 for Stein). After the Club received the payment and signed contract documents, they sent plaintiffs their individual Member Bonds. The Membership Agreement that each plaintiff signed specifically stated "[t]he Member acknowledges that the Membership was acquired solely for the purpose of using the facilities of the Club and that it does not give the Member a vested or prescriptive right or easement to use the Club nor does the Membership provide the Member with an equity or ownership interest in any property owned by the Club." "The Member acknowledges that he or she will not be entitled to share in any of the income generated by the Club, nor will the Club pay dividends to the Member. The Member hereby agrees that the Membership is not being viewed as an investment and does not expect to derive economic profits from the acquisition."

Club membership allowed plaintiffs to use the Club's luxury residences in various cities around the world. Those destinations included, among others, London, Paris, New York City, Vail, Tuscany, Maui, Cabo San Lucas, British Virgin Islands, and Telluride. Prior to joining the Club, McClellan had a membership in a different club, the Private Retreats Club. McClellan

4

traded in his membership to that club for a membership in Distinctive Retreats because Distinctive Retreats had larger residences in better locations. McClellan bought his Club membership largely to use the Club's facilities for recreational purposes. The fact that McClellan could possibly make some money off his Club membership was a small reason that he joined the Club. After McClellan purchased his Club membership, he did not learn anything about whether the membership was increasing in value because he was not considering redeeming the membership. He was traveling and using the Club's residences. Prior to filing for bankruptcy, the Club was delivering what McClellan expected — luxury travel facilities that were larger than the residences in his previous club.

McClellan received the Club's Rules and Regulations, Membership Offering, Membership Agreement, and Addendum before he joined. McClellan only relied on the statements in those documents when he purchased his Club membership. He agreed that his Club membership was for recreational use and that he largely bought the membership to use the Club's facilities. Mosley joined the Club at approximately the same time as McClellan and received similar membership documents. Mosley read and signed the appropriate documents.

McClellan and Mosley both paid a $392,000 "deposit" for their club memberships and received a document entitled a "Member Bond." The document provided that the Club would return the $392,000 deposit to the person holding the "bond" on December 31, 2034 if that person did not choose to renew the bond, at no additional charge, for an additional 30 years. The bond was not redeemable within 18 months from the date of issuance and specifically stated that the holder was not entitled to any interest payments. The Club membership and bond were non-transferable except through the Club or inheritance. According to the terms of their membership,

5

if McClellan or Mosley chose to resign from the Club prior to December 2034, their $392,000 deposits would be refunded within 30 days of when the membership was resold to a new Club member, or within one year of written notice of the member's intent to resign his membership. If the membership had increased in value at the time it was reissued, McClellan and Mosley would be entitled to 40% of the difference between the reissuance amount and the original $392,000 membership deposit. In order words, if McClellan resigned his membership and it was reissued to a new member for $400,000, McClellan would be entitled to $3,200 (40% of the $8,000 increase in the value of the membership). If Mosley relinquished his membership and a different prospective member offered $410,000 for Mosley's membership, he would be entitled to $7,200 (40% of the $18,000 increase in the value of the membership). If the memberships were not reissued for at least $392,000, McClellan and Mosley would be entitled to a refund of their original $392,000 deposit. McClellan and Mosley did not resign their membership prior to Distinctive Retreats LLC's bankruptcy filing and, to date, their $392,000 membership deposits have not been refunded.

Glazer and Stein joined the Club a year after McClellan and Mosley and paid more for their Club memberships. Glazer paid $425,000 for his membership and Stein paid $450,000. Glazer received and read the membership documents, but he may not have read every word of those documents. When Glazer purchased his Club membership, he thought that membership entitled him to use of the Club's properties, which was extraordinarily important to him. Glazer also believed that his original $425,000 membership deposit was secure and 100% refundable.

Stein's primary purpose in joining the Club was to use the Club's facilities. (*Stein Dep.* at 121). The membership terms that Glazer and Stein negotiated were slightly different than the

ones McClellan and Mosley agreed to. The membership documents indicate that Glazer's membership deposit was $450,000. However, Glazer received a $25,000 credit at the time he joined the Club and only paid $425,000 for his membership and accompanying bond. Glazer's addendum provided that he would be entitled to a 100% refund of the $425,000 purchase price upon resignation and reissuance of his membership. If Glazer waited at least 18 months to resign his membership, he would be entitled to an additional $25,000 above the $425,000 purchase price, for a total of $450,000. The dollar amount listed on Glazer's Member Bond is $450,000. Stein's membership documents indicate that his membership deposit was $475,000. Stein also received a $25,000 credit when he joined the Club and only paid $450,000 for his membership and accompanying bond. Stein's addendum provided that he would be entitled to a 100% refund of the $450,000 upon resignation and reissuance of his membership. If Stein waited at least 24 months to resign his membership, he would be entitled to an additional $25,000 above the $450,000 purchase price. The dollar amount listed on Stein's Member Bond is $475,000. In all other relevant aspects, the terms of Glazer's and Stein's memberships and bonds were the same as those of McClellan and Mosley.

After they joined the Club, all four plaintiffs used its facilities. Mosley and his family used the Club's luxury residences for at least eight trips, including a two-week ski trip to Telluride, Colorado. Glazer and his family used the Club's residences for more than 20 trips, including a week in Tuscany, Italy. McClellan and his family also used the Club's residences for almost 20 trips, including multiple trips to Cabo San Lucas, Mexico and a trip to Paris, France. Stein does not appear to have used the Club's residences as often as the other plaintiffs, but he did use one of the Club's residences in New York City. McClellan and Glazer used the Club's

7

residences a number of times after the Club filed for bankruptcy. Each night plaintiffs stayed at one of the Club's luxury residences, they paid a $150 service fee, along with any incidental fees for groceries, ski lift tickets, greens fees, etc.

All four plaintiffs understood that there was no public market for their Club memberships. Memberships could only be resold to the Club, or passed down through inheritance. Stein tried to redeem his bond after less than the 24-month holding period because he was not satisfied with the way the Club was operated. The Club filed for bankruptcy in July 2006. At that time, none of the four plaintiffs had successfully resigned their Club memberships and secured refunds of their membership deposits. To date, plaintiffs have not recovered those deposits. The LLC listed on plaintiffs' membership documents and member bonds, Distinctive Retreats, LLC, does not have assets sufficient to repay plaintiffs' original membership payments. Accordingly, in an attempt to recover their membership payments, plaintiffs initiated the instant fraud case against the Kent defendants, who presumably have more liquid assets than Distinctive Retreats, LLC.

## IV. Legal Analysis

### A. Summary Judgement Standard of Review

To succeed on a motion for summary judgment, the moving party must show that the pleadings, depositions, answers to interrogatories, and admissions on file, together with any admissible affidavits do not create a genuine issue of material fact and that it is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must construe all facts in the light most favorable to the non-moving parties,

plaintiffs, and must view all reasonable inferences in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### B. Count I - Securities Fraud (against A&K and Kent)

Plaintiffs claim that the Kent defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder. "The §10(b) private cause of action is a judicial construct that Congress did not enact in the text of the relevant statutes." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 128 S. Ct. 761, 772 (2008). The fundamental purpose undergirding the Securities Acts is "to eliminate serious abuses in a largely unregulated securities market." *Reves v. Ernst & Young*, 494 U.S. 56, 60 (1990) (quoting *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849 (1975)). The Exchange Act was "adopted to restore investors' confidence in the financial markets," but it "extends to uncommon and irregular instruments." *Marine Bank v. Weaver*, 455 U.S. 551, 555-56 (1982). Congress "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Reves*, 494 U.S. at 61. However, Congress did not "intend to provide a broad federal remedy for all fraud." *Id*. (quoting *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982)). In a typical §10(b) private action, a plaintiff must prove: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge*, 128 S. Ct. at 768. Rule 10b-5 only encompasses conduct already prohibited by §10(b). *Stoneridge*, 128 S. Ct. at 768.

9

The threshold question before the Court is whether the Club memberships, including the associated bonds, constitute securities as defined in the Exchange Act. The Exchange Act defines a security as, among other things, "any note, stock, treasury stock, bond, debenture, [and] certificate of interest or participation." 15 U.S.C § 78c(a)(10)[1]. Investment contracts are also subject to regulation under the Exchange Act. *Wals v. Fox Hills Development Corp.*, 24 F.3d 1016, 1017 (7th Cir. 1994). The Supreme Court has repeatedly stated that each of the instruments identified as a security under the Exchange Act is distinct. To lump various instruments together "would make the [Exchange] Acts' enumeration of many types of instruments superfluous." *Reves*, 494 U.S. at 64.

Plaintiffs' assertion that the Club memberships and associated bonds should be treated as securities because Section 78c of the Exchange includes the term "bond", without further inquiry into the characteristics of the disputed instruments, is contrary to law. The fact that a disputed instrument bears a label (i.e. stock, bond, note, debenture) included in Section 78c "is not of itself sufficient to invoke the coverage of the [Exchange Act]." *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 (1985). Instead, the Court must determine whether that instrument possesses "some of the significant characteristics typically associated" with a particular label. *Id*. (internal citation omitted). The Supreme Court has established tests for determining whether an instrument is a stock, note, or investment contract covered under the Exchange Act. *See Landreth Timber Co. v. Landreth*, 471 U.S. 681 (1985) (articulating a test for determining whether an instrument is a stock); *see Reves*, 494 U.S. at 66-67 (articulating a test for

---

[1]The definition of "security" in the Exchange Act is essentially the same as the definition of "security" in Section 2(1) of the Securities Act of 1993, 15 U.S.C. § 77b(1). *Marine Bank*, 455 U.S. at 555, n.3.

10

determining whether an instrument is a note); *see SEC v. Howey*, 328 U.S. 293, 301 (1946) (articulating a test for determining whether an instrument is an investment contract). The Supreme Court has not established a test for determining whether the Exchange Act should apply to a disputed instrument labeled as a bond. The parties agree that this issue presents a matter of first impression for this Court.

Plaintiffs have taken the broad position that the disputed Club memberships and associated bonds are securities under the Exchange Act, but have not specified what type of security instrument they consider them to be. Instead, plaintiffs argue that the Club memberships and associated bonds could correctly be labeled as notes, bonds, or investment contracts. Plaintiffs do not contend that they are stocks and, therefore, the Court will not consider whether the Club memberships and associated bonds qualify as stock securities under *Landreth*. However, the Court will consider each of the other three types of securities in turn.

### 1. Investment Contracts

First, the Court turns to whether the Club memberships were investment contracts. It finds that they were not. An investment contract is an investment program that involves: (1) an investment of money (2) in a common enterprise (3) with profits to come solely from the efforts of others. *SEC v. Howey*, 328 U.S. 293, 301 (1946). The Club membership agreements and member bonds are not investment contracts because there is no horizontal commonality. *Wals v. Fox Hills Development Corp.*, 24 F.3d 1016, 1019 (7th Cir. 1994). There was no pooling of profits between the individual Club membership owners, which is essential to horizontal commonality. *Id*. In fact, plaintiffs were not entitled to a share of any of the Club's potential profits. The membership agreements that each plaintiff signed specifically stated that plaintiffs

11

were not "entitled to share in any of the income generated by the Club, nor [would] the Club pay dividends to the Member." The agreements also included a provision stating that each member "agrees that the Membership is not being viewed as an investment and does not expect to derive economic profits from the acquisition."

Each plaintiff agreed with Distinctive Retreats, LLC on a redemption amount for his membership bond at the time he joined the Club. The redemption amount was not related to or contingent upon the Club's future profits. Glazer paid $425,000 for his membership. The addendum to his membership agreement provided that he would be "entitled to a full (100%) refund of the purchase price of the Membership Bond $425,000, upon resignation and reissuance of the Bond. Per the terms of the Membership Addendum, if Member resigns Membership after 18 months, Member will be entitled to an additional $25,000 above the purchase price of the Bond equaling $450,000." Stein paid $450,000 for his membership. Similar to Glazer's addendum, the addendum to Stein's membership agreement provided that he would be "entitled to the full $475,000 face value bond upon resignation from Distinctive Retreats as long as the Member does not resign from Distinctive Retreats for a period of time no less than 24 months from the original Membership date. If Member resigns with less than an [sic] 24 month hold period, Member will be entitled only to the refund of the initial $450,000 amount; not the face value of the bond at $475,000." The redemption value of Glazer and Stein's memberships were not based on the Club's profits and thus were not investment contracts.

As addressed above, the addendums to plaintiffs McClellan's and Mosley's membership agreements were slightly different. McClellan and Mosley paid $392,000 for their Club memberships. Their addendums provided that upon resignation and reissuance of each person's

membership, that person would receive 40% of the difference between the reissuance amount and the original membership amount. Unlike Glazer and Stein, these two defendants did not negotiate a preset $25,000 figure if they held their memberships for a certain period of time. Instead, McClellan and Mosley negotiated to receive 40% of the increased value, if any, of their memberships at the time each membership was reissued. The reissue price was based on what another potential Club member was willing to pay for the reissued membership, not the profits generated by the Club. Further, McClellan and Mosley were only entitled to 40% of the increase in their specific membership. If McClellan decided to relinquish his membership and a new prospective member offered $400,000 for that specific membership, under the Addendum, McClellan would be entitled to $3,200 (40% of the $8,000 increase in the value of the membership). If Mosley relinquished his membership and a different prospective member offered $410,000 for Mosley's membership, he would be entitled to $7,200 (40% of the $18,000 increase in the value of the membership). The addendums did not provide for the pooling of potential profits from the resale of multiple Club memberships. If it did, McClellan and Mosley would have both been entitled to $5,200 under this hypothetical; however that is not how the addendum was written. Therefore, there is no evidence of horizontal commonality and the Court finds that, as a matter of law, the Club memberships were not investment contracts. *See Wals,* 24 F.3d at 1019.

### 2. *Notes*

Next, the Court turns to whether the Club memberships and member bonds were note instruments. To determine whether an instrument is a note subject to regulation under the Exchange Act, the Court applies the "economic realities" test set forth in *Reves v. Ernst &*

13

*Young*, 494 U.S. 56, 62 (1990). Courts should not just look at what the instrument is called, but rather analyze the "economic realities" of the subject transaction. *Reves*, 494 U.S. at 66-67. The test begins with the rebuttable presumption that every note is a security. *Id*. at 67. Generally, notes issued in an investment context are securities, and notes issued in a commercial or consumer context are not. *Reves*, 494 U.S. at 63. A note is not a security if it strongly resembles one of a number of judicially determined non-securities. *Id*. If the note does not resemble one of the non-securities, then the Court considers the following four factors: (1) "the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]"; (2) "the 'plan of distribution' of the instrument"; (3) "the reasonable expectations of the investing public"; and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Act unnecessary." *Id*. at 66-67.

Under the first factor, a note resembles a security "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate." *Id*. at 66. Alternatively, a note that is exchanged to facilitate the purchase of a consumer good, or advance some other commercial or consumer purpose will "less sensibly [be] described as a 'security.'" *Id*. Courts must look objectively at "the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]." *Id*. If the surrounding motivations appear to be geared toward a consumer purchase, as opposed to investment, the instrument is less likely to be a security.

The first *Reves* factor favors defendants. Plaintiffs' primary purpose in purchasing the Club memberships was to use the Club's luxury residences. Plaintiffs were primarily acting as consumers, and the undisputed evidence in the record shows that the plaintiffs actually used the Club's residences. They wanted to purchase access to the Club's facilities. The investment portion of the transaction was secondary to plaintiffs. The Club's stated purpose in selling memberships was also commercial in nature. The Club was interested in using the membership deposits to acquire additional luxury residences for use by its members.

The second factor involves a determination of whether "there is a common trading for speculation or investment" of the disputed instrument. "[T]he requisite 'common trading'" is established if the instrument is "offered and sold to a broad segment of the public . . ." *Id*. at 68. According to the parties, there were a very limited number of memberships and less than 400 were issued. These memberships could not be sold on a secondary market and could only be resold through the Club if a new potential member, who met all the qualifications of Club membership, was willing to purchase one. Less then 400 people with approximately $400,000 to invest in a luxury resort membership do not constitute "a broad segment of the public." Accordingly, the second *Reves* factor also favors defendants.

The third factor focuses on whether a reasonable member of the investing public would consider the disputed note an investment. *Id*. at 66. Given the clear disclaimer in the three-page membership agreement each plaintiff signed, the Court finds that the average person would not have considered the disputed Club memberships investments. The membership agreement stated "[t]he Member hereby agrees that the Membership is not being viewed as an investment

15

and does not expect to derive economic profits from the acquisition." This factor also favors defendants.

The final *Reves* factor, risk reduction, focuses on whether the existence of alternative regulatory schemes or other measures, render the protection afforded by the federal securities laws unnecessary. *Id*. at 67. In addition to their securities law claim, plaintiffs have also alleged claims under state consumer protection statutes and common law fraud. Although the consumer protection statutes and common law fraud claims do not render the protections of the federal securities laws completely unnecessary, they do provide plaintiffs with additional avenues of protection. Accordingly, this factor also weighs slightly in favor of defendants.

After considering the four *Reves* factors, the Court finds that the factors weigh in favor of finding that the Club memberships and associated bonds were not note securities under the Exchange Act. The Club memberships and associated bonds were primarily consumer purchases that were not available to a broad segment of the public, could not be traded on a secondary market, and, given the disclaimer in the membership agreement, would not appear to be investments to a reasonable member of the investing public.

### 3. Bonds

Finally, the Court considers whether the Club memberships were bond instruments subject to regulation under the Exchange Act. Since there is no established test for determining whether an instrument should be considered a bond subject to regulation under the Exchange Act, the Court looks to the standard definition of a bond. The Merriam-Webster dictionary defines a bond as an "interest-bearing certificate of public or private indebtedness." *Merriam-Webster Online Dictionary*, 2009. McClellan and Mosley's Club memberships and associated

16

bonds were not interest-bearing instruments and, therefore, are not bond securities under the Exchange Act. McClellan and Mosley paid $392,000 for their Club memberships and were not entitled to any interest on their membership deposits. If McClellan and Mosley had decided to resign their Club membership and the memberships had been reissued for more than $392,000, McClellan and Mosley would have been entitled to 40% of the appreciation in the value of the memberships, but appreciation is not interest. Applying the undisputed facts of this case to the standard definition of a bond, McClellan and Mosley's Club memberships and associated bonds are not bond securities subject to regulation under the Exchange Act.

Glazer and Stein's Club memberships and associated bonds are a closer call. Glazer and Stein did not negotiate to receive a percentage of any appreciation in the value of their Club memberships. Instead, each negotiated a $25,000 "credit" on the purchase price of their memberships and associated bonds. Glazer and Stein argue that this credit is actually interest. Glazer paid $425,000 for a bond with a face value of $450,000. If he held on to the membership and bond for at least 18 months, the Club agreed to pay him $450,000. Stein paid $450,000 for a bond with a face value of $475,000. If he held on to the membership and bond for at least 24 months, the Club agreed to pay him $475,000. The terms of Glazer and Stein's memberships render them much closer to an "interest-bearing instrument" than the terms of McClellan and Mosley's memberships, which raises an interesting question — Could some Club memberships qualify as securities under the Exchange Act, while others do not? Fortunately, the Court does not have to answer that question because it finds that Glazer and Stein's $25,000 credit is not sufficiently close to an interest payment to render those Club memberships bond securities under the Exchange Act.

17

Interest in the context of a "interest-bearing certificate of public or private indebtedness" is generally calculated using a set rate of return over a specific time period. For example, the value of Federal savings bonds are detailed in redemption tables available on the U.S. Treasury Department's website. Traditionally, the return on a bond is not an all-or-nothing proposition. Treasury bonds are purchased at a price significantly less than the face value of the bond and have a set maturity date, at which time, the bonds will be worth the face value. Treasury bonds also cannot be redeemed within a certain time from the date they were issued (generally one year). The value of treasury bonds is not static; the value increases incrementally each month and continues to increase after the maturity date.

The characteristics of Glazer and Stein's memberships and associated bonds are not sufficiently similar to those of treasury bonds for the Court to consider the memberships bond securities under the Exchange Act. First, Glazer and Stein could redeem their memberships and associated bonds at anytime and request a full refund of their membership deposits. The memberships did not have a period of time when they were nonredeemable. Second, Glazer and Stein's $25,000 "credit" was an all-or-nothing proposition that was not based on a set rate of return. If Glazer held his Club membership for at least 18 months before attempting to redeem it, he was entitled to an extra $25,000. However, the $25,000 figure never increased regardless of how long Glazer held onto the membership after 18 months. If Glazer redeemed the membership one day before the 18 month threshold, he was not entitled to any portion of the extra $25,000. The terms of Stein's membership were similar, except he forfeited the entire $25,000 if he redeemed his membership within 24 months of the purchase date. In light of these two factors, the Court finds that Glazer and Stein's $25,000 "credit" is not sufficiently similar to interest to

18

render their memberships and associated bonds interest-bearing certificates. Therefore, the Club memberships and associated bonds are not bond securities subject to regulation under the Exchange Act.

## V. *Conclusion*

Because the Court finds that the Club memberships and associated bonds are not security instruments under the Exchange Act, it does not reach the issues related to plaintiffs' state law fraud claims. Plaintiffs can litigate those claims in the appropriate state courts.

For the reasons stated above, defendants A&K's and Kent's joint amended motion for summary judgment is granted as to Count I, plaintiffs' claim that A&K and Kent violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. On the present factual record, the Court finds that plaintiffs did not purchase securities governed by the Exchange Act. The Court declines to exercise its pendent jurisdiction over the remaining state law claims and the remaining state law claims are dismissed.

ORDERED: All matters over which this Court has subject matter jurisdiction have been resolved. The Court declines to exercise its pendent jurisdiction over the remaining state law claims and those claims are dismissed. This civil case is terminated. It is so ordered.

E N T E R:

_____
George W. Lindberg
SENIOR U.S. DISTRICT JUDGE

DATED: September 22, 2009